IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                          CIV 17-0894 KBM/LF

$65,020 UNITED STATES CURRENCY,
2008 HONDA ACCORD
VIN: JHMCP26738C002908,

       Defendants-in-rem,

*and*

JULIO CESAR FIGUEROA-RIVERA,

       Claimant.

# MEMORANDUM OPINION AND ORDER

       THIS MATTER is before the Court on the United States' Motion for Summary Judgment *(Doc. 28)*. Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. *Doc. 15*. The Court has reviewed the motion, the submissions of the parties and the relevant authorities. On October 26, 2018, the Court also heard the oral arguments of AUSA Stephen Kotz for Plaintiff ("United States" or "Government") and Attorney Adam Flores for Claimant Julio Cesar Figeroa-Rivera ("Figeroa-Rivera" or "Claimant"). For the reasons set forth below, the Court finds that there are no material issues of fact in dispute and that Plaintiff United States is entitled to judgment as a

matter of law as to the $65,029 at issue ("Defendant Currency").[1] Therefore, the motion will be granted, and the Defendant Currency will be forfeited to the United States.

## I. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). The burden then shifts "to the nonmoving party to show that there is a genuine issue of material fact." *Bacchus Indus., Inc., v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Both the movant and the party opposing summary judgment are obligated to "cit[e] to particular parts of materials in the record" to support their factual positions. Fed. R. Civ. P. 56(c)(1)(A). In this district, "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b).

A "genuine" dispute exists where the evidence is such that a reasonable jury could resolve the issue either way. *See Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A mere scintilla of evidence in the non-movant's favor is not sufficient. *Anderson*, 477 U.S. at 252. "When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Hartwell v. Sw. Cheese Co., L.L.C.*, No. CV 15-1103 JAP/GJF, 2017 WL 944125, at *2 (D.N.M. Jan. 23,

---

[1] Claimant has chosen not to contest forfeiture of the defendant vehicle. *Doc. 30* at 4.

2017). "Summary judgment is not 'a disfavored procedural shortcut but rather [it is] an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.'" *Garcia v. Vilsack*, 628 F. Supp. 2d 1306, 1308-09 (D.N.M. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

## II. STANDARD FOR FORFEITURE

"A civil forfeiture proceeding is an *in rem* action that proceeds on the legal fiction that the property itself is guilty of wrongdoing." *United States v. $152,160.00 U.S. Currency,* 680 F. Supp. 354, 356 (D.Colo. 1988). In the past, the Government bore the burden to show probable cause that the property subject to forfeiture was involved in criminal activity. *United States v. $39,000 in Canadian Currency*, 801 F.2d 1210, 1216 (10th Cir. 1986). However,

> [t]he Civil Asset Forfeiture Reform Act of 2000 change[d] the government's initial burden of proof. Pursuant to 18 U.S.C. § 983(c)(1), the "burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture."

*United States v. Wagoner Cty. Real Estate*, 278 F.3d 1091, 1097 n.5 (10th Cir. 2002) (quoting 18 U.S.C. § 983(c)(1)). To prevail in the case at hand, the "Government must show by a preponderance of the evidence that the currency at issue was the proceeds of drug offenses or used or intended to be used to facilitate a drug offense." *United States v. U.S. Currency Totaling $101,207.00*, No. CV 101-162, 2007 WL 4106262, at *5 (S.D. Ga. Nov. 16, 2007).

Claimant contends that the Government "bears the burden to establish a 'substantial connection' between the offense and the property." *Doc. 30* at 2 (citing

*United States v. $252,300.00*, 484 F.3d 1271, 1272 (10th Cir. 2007). The applicable

statute provides:

> **(c) Burden of proof**. -- In a suit or action brought under any civil forfeiture
> statute for the civil forfeiture of any property--
> (1) the burden of proof is on the Government to establish, by a
> preponderance of the evidence, that the property is subject to forfeiture;
> (2) the Government may use evidence gathered after the filing of a
> complaint for forfeiture to establish, by a preponderance of the evidence,
> that property is subject to forfeiture; and
> (3) if the Government's theory of forfeiture is that the property was used to
> commit or facilitate the commission of a criminal offense, or was involved in
> the commission of a criminal offense, the Government shall establish that
> there was a substantial connection between the property and the offense.

18 U.S.C. § 983. The Government cites to opinions of other circuits which hold that

> [t]he unambiguous language of § 983(c)(3) provides on its face that the
> substantial connection requirement applies only to facilitating property.
> Therefore, the Government need not show a substantial connection between
> seized currency and a drug offense when it bases the forfeiture on a
> proceeds theory.

*Doc. 31* at 3 (citations omitted). Because the Government here premises its theory of

forfeiture on the seized currency as proceeds of drug trafficking, it contends it bears no

obligation to establish a "substantial connection."

Yet the Government concedes that the Tenth Circuit specifically cited to

§ 983(c)(3) in *United States v. $252,300.00* when stating that the Government bore the

"substantial connection" burden in a forfeiture case. *Id.* But the Government argues, and

the Court agrees, that the Tenth Circuit failed to "distinguish between proceeds and

facilitating property" in that opinion. If ruling on a clean slate, this Court would adopt the

Government's position that § 983(c)(3) unambiguously triggers the "substantial

connection" only when the forfeiture theory rests on a facilitation, rather than proceeds,

theory.

Nevertheless, this Court notes that a panel of the Tenth Circuit just last year restated the "substantial connection" burden in a case in which the government argued for forfeiture of currency solely on a proceeds theory. *United States v. $112,061.00*, 693 F. App'x 748, 750 (10th Cir. 2017) (government "alleged that the defendant currency was the proceeds from [the claimant's] unlawful distribution of controlled substances.") (unpublished decision). Yet even assuming the United States must demonstrate here a "substantial connection" between the Defendant Currency and drug trafficking activity, it has done so.[2]

## III. The Undisputed Material Facts Entitle Forfeiture as a Matter of Law

Defendant Currency was found in an after-market hidden compartment in a vehicle driven by Claimant when it was stopped at 8:22 a.m. on March 23, 2016 by Bernalillo County Deputy Sheriff Leonard Armijo. Deputy Armijo was also then-assigned to the Homeland Security Investigations interdiction unit.

In response to the Statement of Undisputed Material Issues of Fact filed by the Government, Claimant asserts his Fifth Amendment privilege against self-incrimination. *Doc. 30* at 1. In this District, "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b). Thus, Claimant has failed to rebut any of the following alleged undisputed facts which the Government contends are indicative of the Defendant Currency being either proceeds or used in connection to a drug trafficking offense.

---

[2] At oral argument, Claimant acknowledged that the United States need not prove a nexus between confiscated currency and a specific controlled-substance exchange. Rather, Claimant asserts that "[t]here must be a nexus 'specifically linking the incriminating circumstances' to a controlled-substance exchange." *Doc. 30* at 2 (quoting *United States v. $22,474.00*, 246 F.3d 1212, 1216 (9th Cir. 2001)). Indeed, the Ninth Circuit case to which Claimant cites did not require a nexus to a specifically-identified drug transaction for the forfeiture of currency. *See id.*

**A. Positive Dog Alert to Scent of Controlled Substance**

In this case, a trained drug detection canine handler deployed his trained and certified drug detection dog, "Terri," to conduct an open-air sniff of the car. The dog alerted positively for the odor of illegal controlled substances at the rear of the car. Claimant acknowledged at oral argument that a canine alert by a certified drug detection dog provides probable cause to search for the presence of controlled substances.

Claimant nevertheless contends that the canine's positive alert has no evidentiary value in the context of this forfeiture case. He relies on the so-called "global contamination" theory – that virtually all cash contains traces of cocaine residue – such that a canine alert is unreliable evidence of a connection of the currency to drug trafficking. Claimant further distinguishes the burden to justify a search (probable cause) from the burden to justify forfeiture (preponderance of the evidence). The Court agrees that a canine's positive alert ***alone*** would be insufficient to meet the Government's burden for forfeiture of currency.

The Court disagrees with Claimant, however, that "global contamination" makes such an alert devoid of evidentiary value. Indeed, the Tenth Circuit has found "no binding authority for the proposition that potential currency contamination renders a canine sniff by a certified narcotics-detection dog unreliable, and we decline to adopt this view." *United States v. Kitchell*, 653 F.3d 1206, 1223 (10th Cir. 2011) (in the context of a motion to suppress in a criminal case). The Court further rejects Claimant's contention that the Government must produce evidence discounting the "global contamination" theory. The Eleventh Circuit has similarly rejected this argument where, as here, the claimant simply "relie[d] on language in opinions from our sister circuits that

6

question the probative value of an alert to drug odor on currency given the high percentage of currency in circulation that is tainted with drug residue." *United States v. Currency, $21,175.00 in U.S.*, 521 F. App'x 734, 740 (11th Cir. 2013) (ordering forfeiture because the claimant "failed to present any evidence at trial on the subject"); *see also United States v. $242,484.00,* 389 F.3d 1149, 1165-66 (11th Cir. 2004) (declining to adopt the "global contamination theory" that currency in circulation is tainted in absence of specific evidence that that effect). The Court therefore finds that the positive alert by the trained and certified canine in the instant case constitutes probative evidence that the Defendant Currency had been in recent proximity to more than trace amounts of illegal drugs.[3]

---

[3] Although the United States produced no evidence, it did note that

> [t]he contaminated currency theory was posited beginning in the mid-1990s. *See, e.g., United States v. $30,060*, 39 F.3d 1039, 1041-43 (9th Cir. 1994). More recent cases and scientific evidence have debunked the contaminated currency theory and upheld the probative value of the dog sniff. *See United States v. $30,670 in U.S. Funds*, 403 F.3d 448, 462 (7th Cir. 2005) (scientific evidence establishes that dogs do not alert to the smell of cocaine but only to the smell of methyl benzoate, a volatile byproduct; thus, dogs do not alert to innocently tainted currency in general circulation but only to currency that "has been exposed to large amounts of illicit cocaine within the very recent past"; older cases deprecating value of the dog alert are unpersuasive); *United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001) (because a drug dog alerts to the presence of methyl benzoate rather than the cocaine itself, a dog alert means that the currency has been in recent proximity to cocaine; distinguishing *United States v. $30,060* on the ground that the court in that case did not have the benefit of scientific evidence that drug dogs alert to volatile chemical by-product that is absent from currency in general); *United States v. $21,055 in U.S. Currency*, 778 F. Supp.2d 1099, 1105 (D. Kan. 2011) (cases from the mid-1990s deprecating the value of a dog sniff are no longer persuasive in light of recent cases supporting the probative value of a positive alert).

*Doc. 31* at 7-8. Especially in light of such decisions, this Court hesitates to impose a burden on the Government to show that the dog would not alert to trace amounts of a controlled substance on currency in the absence of a claimant first coming forth with ***evidence*** to the contrary.

## B. Additional Evidence Indicating Connection to Drug Trafficking

### 1. Vehicle Tag & Insurance Card

The temporary Colorado registration tag displayed on the rear of the car driven by Claimant had an expiration date of May 21, 2016. This expiration date would be consistent with Figueroa-Rivera's statement that he had purchased the car the day before the stop because Colorado's temporary tags are valid for 60 days.

However, Figueroa-Rivera also told Deputy Armijo that he had departed the Denver area immediately after the car's purchase and procuring auto insurance. Yet the Colorado insurance policy card produced by Claimant listed a "Jose Aviles" as the insured and showed that the car had been insured since February 11, 2016, approximately six weeks prior to the traffic stop. Figueroa-Rivera didn't produce any proof of insurance in his own name despite his claim that he had bought insurance just before leaving Denver for Mexico. He simply said that Arviles was a friend from whom he had purchased the vehicle and offered no further explanation.

Moreover, the temporary tag was mounted over a metal license plate and attached to the rear of the car with three screws. Affidavit testimony indicates that individuals such a drug couriers use such plates when they want to move easily in and out of states because they can be quickly switched from front to back to comply with each state's traffic code requirements.

### 2. Extreme Nervousness

When Deputy Armijo asked for his driver's license, registration and insurance, Figueroa-Rivera was extremely nervous and fidgety, his hands were trembling, he would not make eye contact, and he was cotton-mouthed. His nervousness did not

dissipate at any time during the encounter, which Detective Armijo indicates is expected when a stopped driver is informed of the reason for the stop.

### 3. Implausible Travel Plans & Inconsistent Statements

As noted above, Figuero-Rivera stated that he had immediately departed from Denver after purchasing the car and procuring auto insurance. The Deputy found this suspicious because Figueroa-Rivera would have left Denver around midnight when neither auto dealers or insurance companies would have been open.

The stop of the vehicle occurred on westbound I-40 near Albuquerque. Direct travel from Denver to Claimant's stated destination of Mexico via Tucson would be south on I-25 to Las Cruces and then west on I-10 to Tucson – a full two hours shorter than the route Claimant had chosen. Deputy Armijo found suspicious Claimant's statement that he had opted for the longer indirect route because he wanted to go to Flagstaff's outlet center; Deputy Armijo knew that the outlet center is located in Phoenix, not Flagstaff.

The exhaust system was hanging three to four inches lower than normal on a Honda Accord. Upon looking under the rear of the car, the Deputy observed indications of some kind of alteration to the vehicle. Figueroa-Rivera insisted he had just purchased the Honda and denied that he had any work done on the car.

Deputy Armijo specifically asked Figueroa-Rivera if he was traveling with firearms, narcotics or large amounts of currency. Claimant hesitated and, we now know, answered falsely that he did not. In fact, Figueroa-Rivera has provided absolutely no evidence of a legitimate source for the large sum of currency he now claims belongs to him. Lack of a legitimate source of income is a factor showing a nexus to criminal

activity as is Claimant's false denial of traveling with a large amount cash. Claimant's invocation of his Fifth Amendment right to silence does not relieve him of the responsibility to rebut evidence that demonstrates a nexus between the defendant currency and illegal drug trafficking.

### 4. Currency Attributes

The large sum of cash – $65,020 – itself, and other facts relating to it, provide further indicia of a nexus to drug trafficking. The denominations of the currency are yet another factor implicating a link to drug trafficking:

| | |
|---|---|
| 6 | $10 bills |
| 1,843 | $20 bills |
| 150 | $50 bills |
| 206 | $100 bills |

The predominance of $20 bills evidences street level dealing of drugs, as does the manner in which the cash was wrapped – bundled with rubber bands and wrapped in cellophane. Likewise, the hidden location where the cash was found – in one of two after-market compartments under the vehicle – is consistent with being used in or being proceeds of illegal drug transactions. If the currency was legitimately derived, there are much safer and easier ways to move such a large amount of money, for example by a bank wire.

### 5. Modifications to the Car

The exhaust system was riding 3-4 inches low and the rear of the car showed signs of alteration such as tooling of the bolts, fresh paint and the heat shields had been cut. Not only is this inconsistent with Claimant's denial that any work had been recently performed on the vehicle; it seems difficult to believe that a prospective purchaser

would not have first examined the vehicle and observed the modifications before purchasing the car.

Moreover, the Defendant Currency was hidden in one of two non-factory compartments under the vehicle. Dual undercarriage after-market compartments, such as those found here, are used in drug trafficking to separate illegal drugs from the currency used to purchase them. The second hidden compartment was empty; that fact would support an inference that the found cash either would be used to purchase illegal drugs when Figueroa-Rivera arrived in Mexico or represented proceeds from an earlier sale of illegal drugs in the United States.

### C. Totality of Circumstances

Claimant argues that many of the above observations – nervousness, inconsistent statements, routes and source cities – are used in "profiling" drug couriers, and indeed they are. Although "drug courier profiling alone is insufficient to establish probable cause, courts have used it as a factor in considering the totality of the circumstances." *United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1216–17 (9th Cir. 2001). If such evidence can be considered in the context of establishing probable cause for a search, surely it can also be used by the United States to establish its burden for forfeiture.

For the reasons set forth both above and in the Government's motion, memoranda and unrebutted exhibits, the Government has met its burden for forfeiture of the Defendant Currency. That is, given the totality of the circumstances, the undisputed evidence establishes by a preponderance of the evidence a substantial connection of the currency to illegal drug trafficking.

**D. Seizure of Defendant Currency was Lawful**

Contrary to Claimant's assertion, the undisputed facts establish that this is not a case of state and local law enforcement agencies seizing cash and transferring it to federal agents to circumvent the laws of the State of New Mexico that prohibit civil asset forfeiture. As mentioned above, at the time of the seizure of the cash, Bernalillo County Deputy Sheriff Armijo was also assigned to the Homeland Security Investigations interdiction unit. Thus, Deputy Armijo was essentially cross-deputized to a federal law enforcement agency authorized to intercept illegal narcotics and proceeds related to illegal drug trafficking. Simply because he originally stopped the car in connection with his duty to enforce state traffic laws does not diminish Deputy Armijo's authority to interdict illegal narcotics lawfully pursuant to and in compliance with federal law.

Wherefore,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Plaintiff's Motion for Summary Judgment *(Doc. 28)* is **granted.**

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent